UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------x **MEMORANDUM AND ORDER**

QUI LI MEI,                                              12-CV-2545 (FB)

            Plaintiff,

-against-

MICHAEL J. ASTRUE,
Commissioner of Social Security,

            Defendant.
---------------------------------------------------------x

*Appearances:*

| *For the Plaintiff:* | *For the Defendant:* |
|---|---|
| MAX D. LEIFER, ESQ. | LORETTA E. LYNCH, ESQ. |
| 214 Sullivan Street, Suite 3-C | United States Attorney |
| New York, NY 10012 | CANDACE SCOTT APPLETON, ESQ. |
| | Assistant United States Attorney |
| | Eastern District of New York |
| | 271 Cadman Plaza East |
| | Brooklyn, NY 11201 |

**BLOCK, Senior District Judge:**

        Plaintiff Qui Li Mei seeks review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability benefits under the Social Security Act (the "Act"). Both parties move for judgment on the pleadings. For the reasons set forth below, the Commissioner's decision is affirmed; accordingly, the Commissioner's motion is granted and Mei's complaint is dismissed.

**I**

        In March 2009, Mei began experiencing symptoms of anxiety and depression. These included difficulty sleeping, fatigue, delayed physical reactions, feelings of worthlessness and guilt, poor concentration, and thoughts of death. At the time she was

employed as a clothing sample maker.[1]  Because of these problems Mei discontinued working on September 13, 2009, and on August 28, 2011, she filed an application for Supplemental Security Income ("SSI").  The Social Security Administration ("SSA") denied her claim.  Upon Mei's request the Administrative Law Judge ("ALJ") conducted a hearing, and subsequently also denied her claim.  Following an appeal of the ALJ's determination, the Appeals Council denied Mei's request for review, rendering final the Commissioner's decision to deny benefits.  Mei timely sought judicial review.

## II

In applying the familiar five-step process, the ALJ found as to the first four steps that Mei:  (1) had not engaged in substantial gainful activity since September 13, 2009, the alleged onset date; (2) had a "severe impairment" in the form of depression; (3) did not suffer from an impairment meeting the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; and (4) was unable to perform her past relevant work as a sample maker. AR 14-20.  Turning to step five, the ALJ determined that Mei had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, subject to the following nonexertional limitations:  that the work be limited to simple, routine and repetitive tasks in a job requiring only occasional decision-making and changes in work setting; that it require only occasional interaction with the public or coworkers; and that it not require a fast-paced

---

[1]A clothing sample maker, or garment sample stitcher, performs the following work:  "Marks and cuts out material and sews parts of new style garments, following patterns, sketches, and design specifications, to prepare sample garments . . . . Sews parts and attaches accessories and ornamentations, using needle and thread or sewing machine."  U.S. DEP'T OF LABOR, DICTIONARY OF OCCUPATIONAL TITLES, 785.361.018 (1991).

2

or high volume production quota. AR 16; *see* 20 C.F.R. 1520(g) (setting forth the fifth step in the five-step analysis). Based upon the testimony of a vocational expert, the ALJ concluded that considering Mei's RFC, age, education, and work experience, she was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy," and consequently denied her application.[2] AR at 21.

### III

"In reviewing the final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted); *see also Selian v. Astrue*, 2013 WL 627702, at *6 (2d Cir. Feb. 21, 2013). In determining whether the agency's findings were supported by substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983).

In challenging the Commissioner's determination upholding the ALJ's decision denying her application for disability benefits, Mei claims error at steps three, four and five. As explained below, each of her claims are without merit.

---

[2]The burden of proof is on the claimant in the first four steps, after which it shifts to the Commissioner at the fifth step. *See* 20 C.F.R. §§ 404.1560(c)(2), 416.920(b)-(g).

**Step Three: Listed Impairment under 20 C.F.R. § 404.1520(d)**

Mei argues that the ALJ erred at step three because he should have found that she was disabled since her depression met or medically equaled listed impairment 12.04, "Affective disorders."[3] Mei claims that she satisfied the necessary requirements for this listed impairment.

The ALJ's determination that Mei's depression did not meet or medically equal listed impairment 12.04 was a "reasonable interpretation of the medical evidence in the record." *Brown v. Apfel*, 174 F.3d 59, 65 (2d Cir. 1999). In order to meet or medically equal listed impairment 12.04, and thus "conclusively [be] presumed to be disabled and entitled to benefits," an individual must demonstrate that her impairment meets the "required level of severity." *See Dixon v. Shalala*, 54 F.3d 1019, 1022 (2d Cir. 1995); *see also* 20 C.F.R. § 404.1520(a)(4)(iii). Listed impairment 12.04 requires that an individual's mental impairment result in at least two of the following: "Marked restriction of activities of daily living; [m]arked difficulties in maintaining social functioning; [m]arked difficulties in maintaining concentration, persistence, or pace; [r]epeated episodes of decompensation, each of extended duration." *See* 20 C.F.R. Pt. 404, Subpart P, Appendix 1, § 12.04.

The record does not support the conclusion that Mei's depression met the "required level of severity." Dr. Maddux performed a psychological consultative examination and found that Mei was only "mildly impaired" in attention, concentration, and memory

---

[3]Step three requires an ALJ to consider whether a claimant has an impairment meeting the criteria of a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the ALJ makes such a determination, the Commissioner "will find [the claimant] disabled." 20 C.F.R. 404.1520(d).

skills. AR 171. He noted that Mei reported "decreased socialization" but found that this was limited to "occasional arguments with certain family members," and overall her family was "supportive." AR 172. As to daily living, Dr. Maddux stated that Mei reported being able to dress, bathe, groom, cook, clean, do laundry, shop, and take public transportation. AR 172. Similarly, Dr. Apacible, a state psychiatric consultant, found that Mei failed to meet *any* of the requisite functional limitations. Upon review of her file, Dr. Apacible concluded that Mei displayed only "mild" restrictions in daily living, social functioning, concentration, persistence, and pace; and had "never" experienced any extended episodes of deterioration. AR 192. Finally, the record contained numerous medical reports stating that since the alleged onset date, Mei's depression had not required inpatient hospitalization, emergency room treatment, or intensive outpatient therapy. AR 170 (Report of Dr. Maddux); 177 (Report of treating physician Dr. Congzhen Ou); 198 (Report of Dr. Apacible); *see also* 20 C.F.R. Pt. 404, Subpart P, Appendix 1, § 12.00(C)(4) ("Episodes of decompensation may be inferred from . . . documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household) . . . .").

The ALJ's decision demonstrates that in making the step three determination, he thoroughly reviewed and considered all of the medical evidence. Accordingly, there is no reason to disturb this conclusion.

**Step Four: The RFC Determination**

Mei argues that the ALJ erred in making his step four RFC determination because he did not properly consider a number of medical opinions. She also contends that

5

the ALJ should have afforded her testimony "substantial credibility," and considered her husband's testimony.

1. **Medical Opinions**

Mei takes issue with the ALJ's consideration of medical opinions offered by Dr. Congzhen Ou, Dr. Apacible, Dr. Maddux, and Dr. Kropsky.

a. **Dr. Congzhen Ou**

Mei claims that the ALJ incorrectly determined that Dr. Ou reported Mei exhibited a "normal mental state." This assertion mis-characterizes the record—the ALJ actually said that Dr. Ou's "mental status examination" of Mei was "largely normal." AR 20. Regardless, the ALJ's characterization of Dr. Ou's mental status examination was well-supported by the record. As Mei's treating physician, the ALJ accorded Dr. Ou's opinion "significant weight," acknowledging that he had treated her on a weekly basis for more than three years. AR 20. The ALJ discussed at length Dr. Ou's findings, including his report that over the course of their years long treatment relationship, Mei had experienced only four depressive episodes.[4] AR 177. Dr. Ou found that each typically lasted one to two weeks, and that Zoloft and Abilify, which he prescribed, alleviated Mei's symptoms without side effects. AR 177, 250 (noting that Mei had "tolerated [the] medications well"). Dr. Ou reported that apart from experiencing these infrequent depressive episodes, Mei was not otherwise limited in her abilities to sleep, communicate, work, interact socially, or perform other activities of daily living. AR 175-81. And while Mei had once been hospitalized for depression in China

---

[4]These occurred in February 2009, September 2009, February 2010, and February 2011. AR 177.

6

in 1993, in the following 18 years she had not required any additional hospitalization. AR 177. Finally, as the ALJ recognized, Dr. Ou reported that Mei did not display any suicidal features, and that her abnormalities were limited to anxiousness and a constricted mood and affect. AR 178.

b.      **Dr. Apacible**

Mei next asserts that the ALJ erred in giving Dr. Apacible's opinion "great weight" without providing sufficient explanation. She contends that Dr. Apacible's opinion had "no probative value" because he was not an examining source. Dr. Apacible opined that Mei retained the ability to perform entry-level unskilled work on a sustained basis. AR 198. He made this determination after finding that Mei remained able to perform all personal activities of daily living, was responsive and cooperative, displayed good insight and judgment, had a coherent and goal directed thought process, and demonstrated fluent, clear, and expressive speech. AR 198.

The regulations state that "evidence from nonexamining sources" constitutes medical opinion evidence to be considered in making a disability determination. 20 C.F.R. 404.1527(e). The ALJ's opinion acknowledged that Dr. Apacible was a nonexamining medical consultant, and properly determined that Dr. Apacible was nonetheless "deemed an expert for purposes of disability program rules." AR 20; *see* 20 C.F.R. 404.1527(e). As the ALJ explained, Dr. Apacible's conclusions were well-supported by other medical evidence. Indeed, as discussed, treating physician Dr. Ou noted that Mei's activities of daily living were impaired only during her infrequent depressive episodes. Moreover, his examinations revealed that Mei displayed clear, goal-directed speech, thoughts, and perception; and that

7

as to attitude, appearance and behavior she was well-groomed and cooperative. AR 178-79. As noted, Dr. Maddux's examination was also consistent with Dr. Apacible's conclusions. AR 172 (finding Mei was able to dress, bathe, groom, cook, clean, do laundry, shop, and take public transportation). Dr. Maddux determined that Mei was able to follow and understand simple directions, perform simple tasks independently, maintain attention and concentration, learn new tasks, make appropriate decisions, deal with stress, and maintain a regular work schedule. AR 172. Finally, his examination revealed that Mei's depression did "not appear to be significant enough to interfere with [her] ability to function on a daily basis." AR 172.

**c.     Dr. Maddux**

Mei argues that the ALJ should not have accorded "significant weight" to Dr. Maddux's opinion because he was not her treating physician. She also claims that Dr. Maddux's opinion was "inherently defective" because he relied upon her husband for Chinese/English translations during the examination. As noted, Dr. Maddux found that Mei's depression did "not appear to be significant enough to interfere with [her] ability to function on a daily basis." AR 172. He arrived at this conclusion after determining that Mei remained able to follow and understand simple directions, perform simple tasks independently, maintain attention, concentration, and a regular work schedule, learn new tasks, make appropriate decisions, and deal with stress. AR 172.

While the regulations provide that treating source opinions are accorded more weight than those of non-treating sources, the ALJ nonetheless correctly determined that Dr. Maddux's opinion was entitled to greater weight because he was a "duly qualified examining source." *See* 20 C.F.R. 404.1527(c) ("Generally, we give more weight to the opinion of a source

who has examined you . . . ."). Furthermore, the ALJ's decision to give Dr. Maddux's opinion significant weight was well-supported by other medical evidence. Consistent with Dr. Maddux, Dr. Ou concluded that Mei was "well groomed" and "cooperative" in mental status, attitude, appearance, and behavior; that her speech, thought and perception were "clear and goal directed"; and that her memory remained intact. AR 178. As previously noted, Dr. Ou likewise reported that Mei's activities of daily living, social interaction, understanding, memory, and concentration were impaired only during her infrequent depressive episodes. AR 179-80 (finding that these episodes lasted one to two weeks and were successfully treated with prescription medications having no side effects).

Finally, Mei contends that Dr. Maddux improperly relied on her husband for translations during the medical examination. Aside from her conclusory statements, Mei does not provide any support for discrediting Dr. Maddux's opinion on this basis — that is, she does not contend that her husband was either incapable or unwilling to provide accurate translations, or that his translations were flawed. If anything, she stood to benefit from her husband's services since he had no incentive to provide inaccurate translations.[5] Dr. Maddux's report supports this conclusion. While he notes that Mei's husband provided interpretations, there is nothing in the report reflecting that this interfered with Dr. Maddux's ability to conduct a thorough and accurate medical evaluation. AR 170-73.

**d.     Dr. Kropsky**

Mei also argues that the ALJ erred by ignoring Dr. Kropsky's determination that

---

[5]Interestingly, Mei does not take issue with Dr. Kropsky's reliance upon her husband's interpretations during that doctor's examination.

9

she had "only a 'fair' prognosis." Dr. Kropsky was an internal medicine consultive examiner who saw Mei to assess whether her depression resulted in physical limitations.

The ALJ's decision demonstrates that he thoroughly considered the entirety of Dr. Kropsky's medical opinion. As the ALJ noted, Dr. Kropsky found that Mei's symptoms had improved with psychiatric treatment, and that her episodes of depression were limited to "every few months." AR 166. The ALJ recognized that Dr. Kropsky diagnosed Mei with depression, and that despite her self-proclaimed restrictions in activities of daily living, his own physical examination revealed that she "has no physical limitation." AR 168. Finally, the ALJ noted that Dr. Kropsky's examination had shown "no abnormalities in terms of general appearance, gait and station, or her musculoskeletal or neurological systems." AR 18. Dr. Kropsky's opinion thus supported the ALJ's conclusion that "the objective evidence of record . . . does not support [Mei's] allegations of a disabling psychiatric impairment that causes significant daily symptoms and leaves her unable to accomplish much productive activity." AR 18. While the ALJ's opinion does not explicitly discuss Dr. Kropsky's "fair" prognosis, this is not a basis for finding error. *See Mongeur*, 722 F.2d at 1040 ("Where, as here, the evidence of record permits [the Court] to glean the rationale of an ALJ's decision, [the Court] do[es] not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.").

## 2. The ALJ's Credibility Determination

Mei asserts that the ALJ failed to properly afford her "substantial credibility" in light of her "successful work history of more than ten years." The ALJ credited Mei's "strong

10

recent work history, which would ordinarily be a point in her favor." AR 19. However, he also noted that Mei had "opted to receive unemployment insurance benefits for over two years"—benefits that required her "to certify that she was ready, willing and able to work." AR 19. The ALJ found that this was "another factor" to be considered, and that the medical evidence "tend[ed] to indicate that the extent of [her] symptoms [we]re not as significant as she alleged during the hearing." AR 19.

The regulations provide that a fact-finder "will consider all of the evidence presented, including information about [an applicant's] prior work record." 20 C.F.R. § 416.929(c)(3). Although "[a] claimant with a good work record is entitled to substantial credibility when claiming an inability to work . . . [w]ork history [ ] is but one of many factors to be utilized by the ALJ in determining credibility." *Marine v. Barnhart*, 2003 WL 22434094, at *4 (S.D.N.Y. Oct. 24, 2003). Thus, while "a plaintiff with a long work history is entitled to 'substantial credibility,' the Commissioner may discount a plaintiff's testimony to the extent that it is inconsistent with medical evidence [in the record] . . . ." *Carvey v. Astrue*, 2009 WL 3199215, at *10 (S.D.N.Y. Sept. 30, 2009).

Review of the record supports the ALJ's determination that plaintiff's claims about her symptoms and limitations were not fully credible. The ALJ first found that despite Mei's assertions to the contrary, the medical evidence did not "reveal a significant duration or persistence of her [depression]." AR 17. As Dr. Ou reported, he had been Mei's treating physician for close to three years, yet during that time she had experienced only four depressive episodes, each lasting one to two weeks, and which were successfully treatable with prescription medications. AR 177. Dr. Kropsky similarly found that while Mei

11

experienced periods of depression, these were limited in frequency to "every few months." AR 166.

The ALJ also correctly concluded that Mei's statements about the side effects of her prescription medications were inconsistent with the record medical evidence. While she testified that the medications used to treat her depression "messed [her] up," AR 19, 39, Dr. Ou repeatedly found that there were "no side effects reported" in conjunction with her use of Zoloft and Abilify. AR 177, 250. Furthermore, although Mei also testified to experiencing hallucinations and thoughts of suicide, Dr. Ou stated that she never reported this to him. AR 178, 250. Dr. Maddux similarly noted that Mei had "denied" having thoughts of suicide, AR 170, and Dr. Apacible found "no evidence of hallucinations, delusions, or paranoia." AR 198.

Lastly, the ALJ noted discrepancies in the record and Mei's testimony concerning her ability to perform daily activities. During the hearing, Mei testified that she "generally [] stays home, [and] doesn't go out," and that she also experienced limitations in her abilities to bathe, dress, and use the bathroom. AR 33. However, once again, Dr. Kropsky's examination revealed "no physical limitation[s]," AR 168, and Dr. Maddux reported Mei was able to "dress, bathe, groom, cook, clean, do laundry, shop, and take public transportation." AR 172. Finally, Dr. Apacible likewise concluded that the record demonstrated Mei's retention of "the ability to perform all personal [activities of daily living] [including] cook, clean, [] do laundry . . . shop and travel independently using public transportation." AR 198.

**3. Mei's Husband's Testimony**

Finally, Mei asserts that the ALJ ignored her husband's testimony and found that it was "exaggerated" and "inaccurate." However, it is evident from the ALJ's opinion

12

that he thoroughly considered her husband's testimony. His decision discusses Mr. Mei's testimony that his wife "used to love her work," but that her depression caused her to "experience[] emotions . . . and difficulty doing chores like taking care of her children or herself." AR 17. While the ALJ concluded that Mr. Mei's testimony could "not be given full credit to establish the presence of a disabling impairment," AR 20, this decision was well-supported. The ALJ explained that although he found Mr. Mei's testimony "sincere," it was not sufficient to outweigh contrary evidence. Mr. Mei testified that Mei was unable to "do anything else . . . like tak[e] care of the kids," and that she had to be fed and "force[d] to go to the bathroom." AR 41. However, these statements were inconsistent with the reports of Drs. Kropsky, Maddux, and Apacible, who collectively found that she exhibited "no physical limitation[s]," AR 168, that she was able to "dress, bathe, groom, cook, clean, do laundry, shop, and take public transportation," AR 172, 198, and that she retained "the ability to perform all personal [activities of daily living] [including] cook, clean, [] do laundry . . . shop and travel independently using public transportation." AR 198.

The ALJ's step four RFC determination, therefore, was supported by careful consideration of the full administrative record. *See* SSR 85–15 ("The reaction to the demands of work (stress) is highly individualized . . . impairment-related limitations created by an individual's response to demands of work . . . must be reflected in the RFC assessment."). Accordingly, his conclusion that Mei is capable of working in low-stress environments was based upon substantial evidence. *See Dumas v. Schweiker*, 712 F.2d 1545, 1551, 1553 (2d Cir. 1983) (an ALJ determination was supported by substantial evidence where the decision contained "a complete and detailed recitation of the medical records and reports").

13

**Step Five: The Vocational Expert's Testimony**

Finally, the Commissioner satisfied his step five burden by demonstrating that Mei was able to perform other work available in the national economy. In so concluding, the ALJ relied upon the testimony of vocational expert Christina Boardman. During the hearing, the ALJ questioned Ms. Boardman about the work prospects of a hypothetical individual "of the same age, education, and work experience as the claimant," whose work "should be limited to simple, routine, and repetitive tasks, and a low-stress job . . . define[d] as having only occasional decision-making and only occasional changes in the work setting, and only occasional interaction with the public." AR 42-43. The expert opined that "past work [would be] eliminated," yet stated that there were "other jobs in the regional or national economy" that an individual with these limitations could perform. AR 43. Ms. Boardman testified that this individual could work as a retail trade marker, linen room attendant, or a silver wrapper.[6] She also testified that her conclusions would not change if the individual was precluded from work that was "fast-paced" and "high-volume product," and that was limited to having occasional interactions with coworkers. AR 44. On this basis, the ALJ concluded that Mei was "not disabled" within the meaning of the Act. AR 21.

---

[6]The expert relied upon the Department of Labor's Dictionary of Occupational Titles, and further testified to the following estimated employment figures: retail trade marker (63,730 jobs in the region, 1,795,970 nationally) (DOT 209.587-034), linen room attendant (63,730 jobs in the region, 1,795,970 nationally) (DOT 222.387-030), silver wrapper (18,510 jobs in the region, 505,950 nationally) (DOT 318.687-018). Ms. Boardman explained that a linen room attendant stores linens and keeps inventory of towels "in establishments such as hotels, hospitals, and clinics." AR 43. A retail trade marker "[m]arks and attaches price tickets to articles of merchandise to record price and identifying information," and a silver wrapper "[s]preads silverware on absorbent cloth to remove moisture." U.S. DEP'T OF LABOR, DICTIONARY OF OCCUPATIONAL TITLES, 209.587-034, 318.687-018 (1991).

Mei argues that the ALJ should have accepted as determinative Ms. Bordman's opinion that an individual who "couldn't sustain sufficient concentration or persistence or pace to do even simple, routine, and repetitive tasks on a regular and continuing basis," would be precluded from work. "It is standard practice for the Commissioner to use vocational expert testimony to satisfy his burden of showing that there exist jobs that the claimant is capable of performing, and the ALJ may rely on the testimony of such an expert, including responses to hypotheticals." *Matta v. Astrue*, 2011 WL 4975841, at *3 (E.D.N.Y. Oct. 19, 2011); *see also Butts*, 388 F.3d at 384 (2d Cir. 2004) (same). Mei erroneously seeks to rely upon Ms. Bordman's response to an irrelevant hypothetical—that is, a hypothetical individual having limitations not exhibited by Mei. Thus, the ALJ's decision not to credit this portion of Ms. Bordman's testimony was justified. *See Mongeur*, 722 F. 2d at 1040. ("Where, as here, the evidence of record permits [the Court] to glean the rationale of an ALJ's decision, [the Court] do[es] not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.").

The ALJ properly based his disability determination on a thorough analysis of Mei's RFC, age, education, and work experience. The ALJ considered substantial evidence in reaching his conclusion that Mei was "not disabled," including numerous medical records pertaining to Mei's symptoms, their frequency, duration, and ability to be remedied with medication, as well as the corresponding limitations she experienced as a result. After performing a thorough RFC assessment, he noted that Mei was "34 years old, which is defined as a younger individual [], on the alleged disability onset date . . . has at least a high school

education," and had past relevant work as a clothing sample maker. AR 20. Thus, "the ALJ based its decision on the substantial evidence," and there is no reason to disturb the disability determination. *Lazore v. Astrue*, 443 F. App'x 650, 653 (2d Cir. 2011) (affirming the district court's judgment denying benefits, where the ALJ considered the claimant's "relative youth and his past work experiences" in concluding that he was "not materially restricted in engaging in 'the full range of unskilled, light work'.").

## IV

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is granted, the final decision to deny benefits under the Act is affirmed, and Mei's complaint is dismissed.

**SO ORDERED.**

_/s/ Frederic Block_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
July 11, 2013